UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LEON DANIELS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:05-0736 |
| ) | Judge Echols |
| SQUARE D COMPANY, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM

Pending before the Court in this employment discrimination action is Defendant Square D Company's ("Square D's) Motion for Summary Judgment (Docket Entry No. 21). The motion has been fully briefed by the parties.

### I. PROCEDURAL BACKGROUND

On July 28, 2004, Plaintiff Leon Daniels ("Daniels") filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in which he claimed that his employer, Square D, denied him promotions because of his age and race and also that he had been subjected to a hostile work environment. Subsequently, on September 22, 2005, Plaintiff filed a pro se Complaint in this Court in which he only alleges Square D discriminated against him on the basis of race when it failed to promote him to a manufacturing liaison position. (Docket Entry No. 1).

After Square D filed its Motion for Summary Judgment, Plaintiff, still proceeding pro se, filed a response in opposition

1

(Docket Entry No. 31). However, Plaintiff then secured counsel and an Amended Response was filed (Docket Entry No. 38),[1] to which Defendant filed a reply (Docket Entry No. 44). Hence, in ruling on the Motion for Summary Judgment, the Court will consider the Memorandum filed in support thereof, as well as the Amended Response and the Reply thereto. See, Smith v. AFSCME Illinois Council 31, 2006 WL 3333596 at *5 n.6 (C.D. Ill. 2006)(where pro se plaintiff submitted response to summary judgment motion before counsel entered appearance and filed a response, court would ignore pro se filing); Barnes v. Barnes, 2004 WL 1107669 at *1 (N.D. Tex. 2004)(an amended response completely supersedes prior response and thus court need only consider the amended response).

## II. FACTUAL BACKGROUND

Most of the facts are not disputed. Construed in Plaintiff's favor as they must be for present purposes, the facts are as follows.

Plaintiff is an African American male who holds an Associate Degree in Engineering Technology. He is not a licensed, nor "fully degreed" engineer.

In 1981, he first became employed by Square D at its Smyrna, Tennessee plant as an engineering assistant. At that plant, Square D manufactures electrical medium voltage switchgear and motor

---

[1]Counsel also responded to Defendant's Statement of Undisputed Facts (Docket Entry No. 37).

2

control centers. Plaintiff worked at Square D until August 1993 when he voluntarily left to take a job in Ohio. Square D rehired Plaintiff on November 3, 1994 where he remains employed.

Since 1998, Plaintiff has worked in the Design Engineering Department and currently holds the title of Senior Designer.[2] Designers, such as Plaintiff, receive instructions from the degreed engineers.

The engineers and designers in Square D's Order Engineering Department design customized electrical products in accordance with customer specifications. They create drawings and bills of material that are used by the production assemblers in the Manufacturing Department to produce the products.

During the assembly of customized orders, there are frequently last minute changes to the drawings or errors in the original drawings which must be resolved before production can be completed. Historically, engineers from the Order Engineering Department worked with the assemblers in the Manufacturing Department to resolve such production issues, requiring that engineers be taken away from their normal job duties.

In early 2004, the Order Engineering Department became flooded with customized orders and the department determined that the engineers did not have time to help resolve the manufacturing

---

[2]From 1998 to 2004, Plaintiff held the title "engineer," although he has always performed "designer" work.

3

issues. Designers David White ("White") and Ronnie Holland ("Holland") were temporarily assigned on different occasions to assist with these "manufacturing liaison" duties. When it became apparent that the designers could no longer be spared to perform these tasks, Brian Walker ("Walker"), the Engineering Supervisor in the Order Engineering Department, received permission to create a full-time position for a manufacturing liaison.

In consultation with his manager, Charlu Frazier, Walker drafted a job description and position requisition. The job opening for a manufacturing liaison was posted on June 8, 2004.[3]

The job description stated that the position "will be single point of contact for assembly and test, responsible for quick resolution of mechanical, electrical, and application related issues for orders in the manufacturing floor. Will perform root cause analysis and drive correction action activity." (Docket Entry No. 22 at 4; Pf. Ex. 9). Hence, the primary duty of the liaison would be to quickly identify and solve problems that occur between Order Engineering's design of a custom product and Manufacturing's assembly of that product.

---

[3]As originally posted, the manufacturing liaison position required a Bachelor of Science degree in engineering and at least five years of experience with MV switchgear. However, because Square D could identify no qualified applicants with a Bachelor of Science degree in engineering, that requirement was eliminated and replaced with the requirement that the applicant have ten years of experience.

4

In addition to the requisite mechanical and technical background, the position required strong verbal and written communication skills. It also required that the selected individual have the "ability to foster communication across functional work groups" and "be well organized and capable of working with minimum supervision," since the selected individual would be working on the shop floor the majority of the time. (Id.)

Four internal applicants applied for the position: Plaintiff, David White (Caucasian), Ronald Holland (Caucasian), and Gerald Carr (Caucasian). Carr, however, withdrew after his interview.

Walker assembled two interview teams. The first team consisted of managers from the Manufacturing Department, while the second consisted of managers from the Order Engineering Department.

Each of the applicants separately interviewed with both teams. The interview teams based their recommendations on the interviews, the applicants' resumes, and their personal experience working with the applicants, since each applicant had worked for Square D for a number of years.

Earl Dworak ("Dworak"), a Senior Supervisor in the Manufacturing Department and member of the interview team, had worked with Plaintiff in the past. Dworak claims he told the interview team that on many occasions, Plaintiff's work could not be manufactured because of errors in his drawings which required engineering changes to make the drawings manufacturable. Dworak

5

also claims he told the interview team that he also observed Plaintiff frequently socializing with assemblers in the Manufacturing Department, leading him to believe that Plaintiff would not be able to quickly and efficiently resolve problems on the manufacturing floor.

Walker claims that managers in the Manufacturing Department reported to him Plaintiff spent too much time socializing, Plaintiff was slow to react to problems, Plaintiff was not as productive as he should be, and Plaintiff did not have the right personality to analyze the root cause of a problem and create a course of action to resolve it. Walker was also informed that Plaintiff was "conflict avoidant" and there was concern that Plaintiff would compromise the best solution to a problem in order to avoid conflict with his friends and co-workers. In making the hiring decision, Walker strongly considered the input from the Manufacturing Department managers because the Manufacturing Department is Order Engineering's internal customer.

Walker claims that given the various concerns expressed by the manufacturing team, the interview teams reached a consensus recommendation to eliminate Plaintiff from further consideration, which Walker accepted. Ultimately, Walker decided that none of the applicants had the necessary skills for the liaison position and Walker received permission to downgrade the position to a non-senior level position.

Walker separately offered Holland and White the opportunity to laterally transfer into the manufacturing liaison position with a five-percent raise. Walker states both were selected because they had performed the position in the past and there were no concerns expressed about their socializing. Both declined and the position went unfilled due to a company-wide hiring freeze.

In early 2005, Square D assigned another Designer, Daryl Webb ("Webb"), an African-American, to perform the manufacturing liaison duties. Webb continues to perform those duties today. However, Plaintiff claims that Webb is not qualified for the position because he was an assembler and as such "did not have the technical knowledge of design, electrical and mechanical standards." (Daniels Aff. ¶ 3).

After being informed that he was not selected for the Manufacturer's Liaison position, Plaintiff met with Square D's Human Resources Supervisor, Danita Wrenn ("Wrenn"), to inquire about the reasons why he was not selected. Wrenn told Plaintiff that he was too friendly with his co-workers and there was concern that he would not be aggressive enough in attempting to resolve problems. Plaintiff denies that he socialized too much. (Daniels Aff. ¶ 4).[4]

---

[4] Plaintiff's Affidavit is misnumbered 1, 2, 4 and 3 and was not filed as a separate entry. (Docket Entry No. 38-4).

7

Case 3:05-cv-00736   Document 46   Filed 12/21/06   Page 7 of 20 PageID #: 434

Square D has a policy prohibiting harassment and provides for a complaint procedure. Plaintiff was aware of the harassment policy and received harassment training.

In January 2004, Plaintiff reported to Wrenn that Dan Maxwell ("Maxwell") (a former Square D employee contracted to work in the design group) made revisions to Plaintiff's drawings and put his initials in the "drawn by" block. Plaintiff also complained that he was being under-utilized and micro-managed. Wrenn asked Plaintiff if he had discussed these issues with his manager, to which Plaintiff responded in the negative. Plaintiff was encouraged to address the issues with Darwin Dryden ("Dryden"), his manager.

Shortly thereafter, Wrenn followed-up with Dryden, who explained that there had been a few instances where the initials on the drawings were changed, but normally the engineer would put his initials in the "drawn by" box if his drawing was copied into new drawings. Otherwise, if a revision were made to one of Plaintiff's drawings then the engineer would place his or her initials in the "revised by" block. In any event, Dryden stated Plaintiff had met with him and they had resolved the issue.

Several weeks later, Plaintiff met with Wrenn and reported that he felt like he was no longer the "go to" guy on his work team. Plaintiff expressed disappointment that his team leader, James Stacy ("Stacy"), had been giving more challenging assignments

8

to Maxwell. Stacy was not a member of management and had no supervisory authority over Plaintiff. Again, Wrenn asked whether Plaintiff had addressed the issue with his manager and Plaintiff said he had not because he was concerned he would not handle the conversation well. Wrenn suggested ways that Plaintiff could approach the subject with Dryden. Several days later Wrenn asked Dryden if Plaintiff had addressed his concerns with him and Dryden told Wrenn he had.

Since making these complaints, Plaintiff admits that "everything has been pretty nice," and that he is happy working at Square D. At no time did Plaintiff ever suggest that race was an issue in regard to these complaints. Moreover, Plaintiff admits that while be believes race was a factor in his treatment, he has no evidence that he was treated poorly because of his race.

### III. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.

9

See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### IV. APPLICATION OF LAW

#### A. Age Discrimination and Retaliation Claims

As indicated at the outset, Plaintiff filed a pro se complaint in which he claimed Square D discriminated against him when it failed to promote him to the manufacturer liaison position. To the extent Plaintiff alleged in his EEOC Charge that he had also been

10

subjected to retaliation and age discrimination, he has specifically and affirmatively abandoned those claims. In his Amended Response to the Motion for Summary Judgment, Plaintiff "concede[s] that there is no evidence which could support a claim for hostile work environment or for age discrimination and would therefore for purposes of this motion for summary judgment not oppose [Square D's] motion with regard to the hostile work environment or age discrimination claims." (Docket Entry No. 38 at 2). In his deposition, Plaintiff also admitted that he was not pursuing an age discrimination claim. (Daniels Depo. at 135-136).

Those concessions aside, this Court has independently reviewed the viability of an age discrimination or hostile work environment claim. The Court finds no basis for such claims.

Plaintiff cannot prevail on an age discrimination claim because as a part of his *prima facie* case he must show that a similarly situated employee, outside the protected class, was treated differently. Briggs v. Potter, 463 F.3d 507, 514 (6th Cir. 2006). In the context of age discrimination cases, this means that the Plaintiff must show that he was treated differently than a significantly younger person. Grojean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir. 2003). Plaintiff makes no such showing in this case.

As for a hostile work environment claim, it fails for any of a number of reasons. This would include the fact that the

11

activities about which Plaintiff complains, i.e. he was given less challenging work, others initialed the "designed by" block, and he was no longer the "go to guy," do not involve race; there is no showing the allegedly wrongful treatment was pervasive or severe; or any showing Square D failed to take reasonable care to prevent and correct allegedly harassing behavior. Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000).

**B. Discrimination in Failure to Promote Claim**

A claim of discrimination may be established either by the introduction of direct evidence of discrimination, or by circumstantial evidence from which an inference of discrimination may be drawn. Johnson v. Kroger Co., 319 F.3d 858, 864-65 (6th Cir. 2003). Plaintiff admits he has no direct evidence of discrimination so the Court turns to the indirect evidence method of proof.

To establish a *prima facie* case of racial discrimination based on a failure to promote utilizing circumstantial evidence, "a plaintiff generally must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." Dews v. A.B. Dick Co., 231 F.3d 1016, 1020-1021 (6th Cir. 2000). If plaintiff creates a presumption of discrimination by establishing a *prima facie* case,

12

a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision, with the plaintiff then bearing the burden of showing that the defendant's proffered reason is pretextual. Id. at 1021. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Id.

For purposes of the motion for summary judgment, Square D concedes that Plaintiff can establish all of the elements of a *prima facie* case, except the requirement that he was qualified for the position.[5] Square D argues Plaintiff was not qualified because he did not possess adequate communication and problem-solving skills, he spent too much time socializing, and was "conflict avoidant," all of which was reported to Walker by managers who had worked with him. Such factors, perhaps legitimate non-discriminatory reasons, are not compelling in the context of the *prima facie* case.

"At the *prima facie* stage, a court should focus on a plaintiff's objective qualifications." Wexler v. White's Furniture Inc., 317 F.3d 564, 565 (6th Cir. 2003). "[T]he *prima facie* burden

---

[5]The Court notes that ultimately, Webb, an African-American, was placed in the position at issue, meaning that Plaintiff would not be able to establish the fourth element of a *prima facie* case. However, it appears that Defendant concedes this element because two Caucasians, Holland and White, were offered a lateral transfer into the position, while Plaintiff was not.

13

of showing that a plaintiff is qualified can . . . be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required," with the inquiry focusing "on criteria such as the plaintiff's education, experience in the relevant industry and demonstrated possession of the required general skills." Id.

Drawing all inferences in Plaintiff's favor, the Court must conclude that Plaintiff can establish a *prima facie* case regarding his qualifications. Once the Bachelor of Science degree requirement was removed, Plaintiff had the necessary education and experience, having been employed in the field for more than ten years. As far as the Court can discern from the record, he also, objectively, had the requisite general skills for the position.

With this conclusion, the burden shifts to Square D to articulate a legitimate non-discriminatory reason for its decision. It has done so by asserting that Walker decided not to offer Plaintiff the position because Plaintiff had difficulties with problem-solving and communications skills and avoided conflict.

While these factors include some subjectivity, they are allowed to be considered because "reasonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions." Browning v. Dept. of Army, 436 F.3d 692, 695 (6th Cir. 2006)(citation omitted). "Obviously, they will take

14

additional credentials into account, if those credentials would prove useful in performing the job." Id.

Given that employers must have some flexibility in making decisions, it is incumbent upon Plaintiff to submit some evidence that Walker's use of subjective criteria was motivated by an intent to unlawfully discriminate. Id.; see, Denney v. City of Albany, 247 F.3d 1172, 1186 (11th Cir. 2001)("fact that [supervisor's] decisions were based on subjective considerations, such as a candidate's leadership ability and maturity, does not by itself advance Plaintiff's pretext argument"). He has not done so in this case. Instead, Plaintiff challenges the basis for Walker's belief that he (Plaintiff) was too social, avoided conflicts, and lacked necessary problem-solving skills and also challenges other statements contained in the affidavits submitted by Square D.

Plaintiff first contends that Walker's statements in his affidavit about what others told him regarding Plaintiff are hearsay. However, the Sixth Circuit has held that where a decision-maker learns about an employee's behavior from others, the decision-maker can testify as to those statements without running afoul of the hearsay rule if he has a reasonable basis for believing the statements to be true. Bush v. Dictaphone Corp., 161 F.3d 363, 367 (6th Cir. 1998). "Because [Plaintiff] does not challenge the declarant's ["Walker's] reasonable basis to believe

15

that the statements were true, the hearsay rule is inapplicable[.]" Id.

Plaintiff next challenges Walker's affidavit to the extent Walker claims that Holland and White had manufacturing liaison experience because "the interview notes of Holland and White . . . do not demonstrate either had any 'manufacturing liaison' experience." (Docket Entry No. 38 at 5). This argument must be rejected.

Insofar as Plaintiff may be trying to suggest Holland and White did not have the experience indicated by Walker in his affidavit, Plaintiff's bald statement in his brief is not the affirmative evidence required by Rule 56. To counteract a supported statement of fact Plaintiff must "present affirmative evidence, not just affirmative assertions[.]" SEC v. George, 426 F.3d 786, 798 (6th Cir. 2005). Here, Plaintiff does not even present an "affirmative assertion"; he only implies that Walker's statement may not be true. Hence, Walker's affidavit has not been refuted on this point.

Moreover, the interview notes do suggest that both White and Holland had liaison experience. The interview notes attached to Plaintiff's response indicate that "Ronnie" (presumably in reference to Ronnie Holland) "worked as a liaison for a yr" (Docket Entry No. 38, Ex. B at 3) and another interview note reflects "Ronnie worked as factory liaison ~ 1 yr." (Id. at 4). Interview

16

notes for White indicate he has "done it for six months." (Id. at 8).

Next, Plaintiff challenges the affidavit of Earl Dworak, the former Senior Supervisor in the Manufacturing Department insofar as Dworak states that he reported to the interview teams Plaintiff made "errors in his drawings which required engineering changes to make the drawings manufacturable" and that Plaintiff frequently socialized with the assemblers. (Dworak Aff. ¶¶ 4-5). Plaintiff again objects on the grounds that Dworak's interview notes do not reflect such notations.

Contrary to Plaintiff's argument, the interview notes do in fact suggest that Plaintiff may have over-socialized and had a problem with his technical skills. With regard to the former, the interview notes indicate that Plaintiff is "quick to talk." (Docket Entry No. 38, Ex. B at 6). As for the latter, the interview notes indicate Plaintiff had problems "setting up stats, would need help making sense out of data applications." (Id.).

Further, it cannot be said that Dworak was without this knowledge merely because the interview notes do not reflect the same. In his affidavit, Dworak states that his comments were made based upon the fact that he worked with Plaintiff while he was the

17

second shift fabrication supervisor and his statements reflect those observations.[6]

Plaintiff next questions the "reliability" of Square D's reasons for not selecting him for the liaison position by asserting that "a close review of the interview notes (top right corner) indicate that comments were being made to Charlu Frazier, the hiring manager, that Plaintiff should be considered 1st or 2nd and that David White was ranked 3rd." (Docket Entry No. 38 at 6).

Plaintiff fails to provide any evidence that this is in fact what the interview notes show. To the contrary, Charlu Frazier has submitted an affidavit in which she states that the rankings were her choices based upon her personal opinion. Frazier also indicates that after the manufacturing team interviewed job candidates, both teams met and during this meeting members from the manufacturing team indicated they did not want Plaintiff in the liaison position. (Frazier Aff. ¶¶ 4-5). After hearing those concerns, Frazier changed her mind, particularly since the "manufacturing department is the internal customer of the order engineering department." (Frazier Aff. ¶ 6). Thus, it cannot be

---

[6]In its reply, Square D points to Plaintiff's 2004 evaluation as support for the observation that Plaintiff had certain technical difficulties. That evaluation indicates Plaintiff's "attention to detail and documentation quality has not met expectations. This results in lost productivity due to the close review of his work that is required by his peers and Team Leader." (Docket Entry No. 38, Eval. at 2). However, this is of little or no probative value since it was not signed until early 2005, after the interviews in the summer of 2004.

18

said that comments were made to Frazier which ranked the candidates in the way Plaintiff describes.  Moreover, Walker was the decision-maker, not Frazier, and there is no showing that Frazier influenced Walker's decision, or that the personal rankings by Frazier were communicated to Walker.

Finally, in his affidavit, Plaintiff states that "Dar[r]yl Webb who currently holds the manufacturing liaison duties did not meet the minimum objective qualifications to work in the job because he worked as an assembler and did not have the technical knowledge of design, electrical and mechanical standards." (Daniels Aff. ¶ 3).  If this conclusory statement is submitted in an effort to support Plaintiff's race discrimination claim it is of little probative value since Webb, like Plaintiff, is African-American.  In any event, Plaintiff's "perception of his competence, and the incompetence of those competing against him, is irrelevant; the search committee's perceptions and motivations are key." Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir. 1987).

The record in this case clearly shows that Walker decided that Plaintiff was not the best choice for the job, and Plaintiff has proffered no proof from which it can be inferred that Walker's decision was in any way motivated by race.  For that reason, Square D is entitled to summary judgment.

19

## V. CONCLUSION

On the basis of the foregoing, Square D Company's Motion for Summary Judgment (Docket Entry No. 21) will be granted.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE